# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

EDWARD L. FORGIONE, JR.    )
46 Blanchard Rd        )
Marlton, NJ 08053       )
Derivatively on behalf of HUMAN GENOME ) Civil Action No. _____
SCIENCES, INC.,       )
             )
     Plaintiff,    ) **VERIFIED SHAREHOLDER**
             ) **DERIVATIVE COMPLAINT**
v.            )
             ) **DEMAND FOR JURY TRIAL**
H. THOMAS WATKINS     )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
ARGERIS N. KARABELAS    )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
RICHARD J. DANZIG     )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
TUAN HA-NGOC       )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
AUGUSTINE LAWLOR     )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
MAXINE GOWEN       )
c/o THE CORPORATION TRUST INC.  )
351 West Camden Street     )
Baltimore, MD 21201      )
             )
             )
             )

JOHN L. LAMATTINA                          )
c/o THE CORPORATION TRUST INC.             )
351 West Camden Street                     )
Baltimore, MD 21201                        )
                                           )
ROBERT C. YOUNG                            )
c/o THE CORPORATION TRUST INC.             )
351 West Camden Street                     )
Baltimore, MD 21201                        )
                                           )
JÜRGEN DREWS                               )
c/o THE CORPORATION TRUST INC.             )
351 West Camden Street                     )
Baltimore, MD 21201                        )
                                           )
                                           )
            Defendants,       )
                                           )
and                                        )
                                           )
HUMAN GENOME SCIENCES, INC.                )
c/o THE CORPORATION TRUST INC.             )
351 West Camden Street                     )
Baltimore, MD 21201                        )
                                           )
                                           )
          Nominal Defendant.       )
_____

    Plaintiff Edward L. Forgione, Jr. ("Plaintiff"), by and through his undersigned attorneys,

brings this action derivatively on behalf of Nominal Defendant Human Genome Sciences, Inc.

28 UEdwH. Th("HGS" or the "Company") and submits this Verified Shareholder Derivative

Complaint (the "Complaint") against certain current officers and members of HGS' Board of

Directors seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary

duties, waste of corporate assets, and unjust enrichment from July 20, 2009 through November

11, 2010 (the "Relevant Period").  Plaintiff alleges upon personal knowledge as to themselves

and their own acts, and as to all other matters upon information and belief based upon their

attorneys' investigation, which included, but was not limited to a review of United States

Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company, as follows:

## I.  NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of HGS seeking relief on behalf of the Company against certain current and former members of HGS' Board of Directors for their breaches of fiduciary duty during the Relevant Period that have caused and will continue to cause substantial harm to the Company.

2.      During the Relevant Period, the Individual Defendants caused and allowed the Company to issue materially false and misleading statements concerning a potential new drug, Benlysta (also known as belimumab) to be used for the treatment of Systemic Lupus Erythematosus ("SLE"), which is a chronic, life-threatening autoimmune disease.  Specifically, the Company failed to disclose that in the clinical drug trials they conducted, Benlysta was associated with suicide.

3.      On November 12, 2010, the U.S. Food and Drug Administration ("FDA") released its staff analysis of Benlysta, outlining the FDA's safety worries.  The FDA review informed investors for the first time of Benlysta's association with suicide, citing higher cases of suicide and a greater overall death rate with Benlysta over the placebo.

4.      As a result of this disclosure, the price of HGS' common stock dropped over 10%, from a closing price of $26.48 per share on November 11, 2010 to a closing price of $23.60 per share at the end of the day when the FDA staff review was made public.

5.      The Individual Defendants breached the fiduciary duties they owed and owe to HGS by causing the Company to issue materially false and misleading statements; failing to establish and maintain internal controls which would have prevented the Company from

3

disseminating materially false and misleading statements; failing to properly manage and oversee the Company; and wasting corporate assets.

6.      Consequently, HGS has been damaged and continues to be damaged, which damages this suit seeks to recover on behalf of the Company.  Damages to the Company include investigatory costs and litigation costs, and liability it likely will incur, for violations of federal securities laws, including costs for defending against federal securities fraud class action lawsuits filed and to be filed against HGS, such as *Miraglia v. Human Genome Sciences, Inc., et al.* (Index No: 8:2011-cv-03231), filed in the United States District Court for the District of Maryland on November 10, 2011, and *Pokoik v. Human Genome Sciences, Inc., et al*. (Index No: 8:2011-cv-03353), filed in the United States District Court for the District of Maryland on November 21, 2011.

7.      Damages will be incurred as a result of the increased cost of capital for the company, as lenders will require a higher risk premium for funding.  Furthermore, damages will be sustained as a result of HGS' loss of goodwill and reputation.

8.      The Individual Defendants, by their failure to maintain internal controls and by their failure to oversee and properly manage the Company, allowed HGS to conceal harsh truths from the investing public during the Relevant Period, and allowed the Company to issue materially false and misleading statements regarding Benlysta and its harrowing side effects, including suicide.  The Company lacked a sufficient basis for the overly optimistic and positive statements it disseminated to shareholders and the investing public at large.

9.      The true facts, which were improperly concealed or undisclosed from the investing public during the Relevant Period, were that Benlysta was associated with suicide in

clinical studies of the drug leading as far back as 2003, and continuing on through 2009, with both attempted and committed suicides associated with clinical trial patients taking Benlysta.

10.     Because of their failure to maintain internal controls and their failure to oversee and properly manage the Company, the Individual Defendants harmed the Company by causing and allowing it to issue materially false and misleading statements, together with the Company's filings and press releases as filed with the SEC throughout the Relevant Period, thus resulting in exposure to federal securities law violations and other potential liability and costs.  Indeed, due to the Individual Defendants' wrongful acts and omissions, the Company is now exposed to millions of dollars in defense costs and potential liability as a result of federal securities fraud class action litigation filed against HGS.

11.     As a result, Plaintiff seeks, among other things, to recover damages suffered, and to be suffered, by the Company as a result of the wrongful acts of the Individual Defendants as described herein.

## II.     <u>JURISDICTION AND VENUE</u>

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.   Plaintiff is a citizen of New Jersey, and no Defendant is a citizen of that state. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because nominal defendant HGS maintains its principal executive offices in the District.

III.    **PARTIES**

14.     Plaintiff is a current shareholder of HGS who purchased shares of HGS stock during the Relevant Period and continuously held HGS stock through the present. Plaintiff is a resident and citizen of the state of New Jersey.

15.     Nominal defendant HGS is a corporation organized and existing under the laws of Delaware.  HGS is a biopharmaceutical company with its principle executive offices located at 14200 Shady Grove Road, Rockville, Maryland 20850.  HGS is a commercially-focused biopharmaceutical company.

16.     Defendant H. Thomas Watkins ("Watkins") is and has been the Chief Executive Officer ("CEO") and a director of HGS since December 2004, and he is and has been the President of HGS since December 2005.  Watkins breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  HGS paid Watkins the following compensation during the Relevant Period:

| Year | Salary | Bonus | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $716,923 | ----- | $8,438,175 | $550,000 | $150,225 | $9,855,323 |
| 2009 | $700,000 | ----- | $131,100 | $1,050,000 | $30,501 | $1,911,601 |

Defendant Watkins is a resident and citizen of Maryland.

17.     Argeris (Jerry) N. Karabelas ("Karabelas") is and has been a director of HGS since April 2002, and he has been Chairman of the Company's Board since September 2004. Karabelas breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side

effects.  HGS paid Karabelas the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $98,500 | ----- | $208,626 | $270,626 |
| **2009** | $77,700 | ----- | $17,256 | $94,256 |

Defendant Karabelas is a resident and citizen of New Hampshire.

18.    Defendant Richard J. Danzig ("Danzig") is and has been a director of HGS since May 2001, and he is also a member of the Company's Audit Committee.  Danzig breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects. HGS paid Danzig the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $62,000 | ----- | $208,626 | $270,626 |
| **2009** | $59,750 | ----- | $17,256 | $77,006 |

Defendant Danzig is a resident and citizen of Washington, D.C.

19.    Defendant Tuan Ha-Ngoc ("Ha-Ngoc") is and has been a director of HGS since December 2005, and he is also a member of the Company's Audit Committee. Ha-Ngoc breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  HGS paid Ha-Ngoc the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $41,169 | $24,581 | $208,626 | $274,376 |
| **2009** | $78,000 | ----- | $17,256 | $95,256 |

Defendant Ha-Ngoc is a resident and citizen of Massachusetts.

20.     Defendant Augustine Lawlor ("Lawlor") is and has been a director of HGS since March 2004, and he was formerly a member of the Company's Audit Committee.  Augustine breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  HGS paid Lawlor the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| 2010 | $10,288 | $66,962 | $208,626 | $285,876 |
| 2009 | $34,375 | $34,375 | $17,256 | $86,006 |

Defendant Lawlor is a resident and citizen of New Hampshire.

21.     Defendant Maxine Gowen ("Gowen") is and has been a director HGS since February 2008.  Gowen breached her fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects. HGS paid Gowen the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| 2010 | $34,251 | $11,249 | $208,626 | $254,126 |
| 2009 | ----- | $33,000 | $17,256 | $50,256 |

Defendant Gowen is a resident and citizen of Pennsylvania.

22.     Defendant John L. LaMattina ("LaMattina") is and has been a director of HGS since May 2008.  LaMattina breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  HGS paid LaMattina the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $54,000 | ----- | $208,626 | $262,626 |
| **2009** | $52,000 | ----- | $17,256 | $69,256 |

Defendant LaMattina is a resident and citizen of Maryland.

23.     Defendant Robert C. Young ("Young") is and has been a director of HGS since October 2005.  Young breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  HGS paid Young the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $38,264 | $5,486 | $208,626 | $252,376 |
| **2009** | $16,875 | $16,875 | $17,256 | $51,006 |

Defendant Young is a resident and citizen of Pennsylvania.

24.     Defendant Jürgen Drews ("Drews") was a director of HGS from 1998 until his retirement in May 2011.  Drews breached his fiduciary duties to the Company and its stockholders by causing the Company to issue materially false and misleading statements regarding Benlysta and its side effects.  During the Relevant Period, while in possession of material, non-public information concerning the disturbing results of clinical trials associating HGS's drug Benlysta with suicide, Drews sold 112,902 shares of his stock for $2,637,000 in proceeds.   HGS paid Drews the following compensation as a director during the Relevant Period:

| Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|------|-------------------|--------------|---------------|-------|
| **2010** | $21,169 | $21,081 | $208,626 | $250,876 |
| **2009** | $23,875 | $15,375 | $17,256 | $56,506 |

Defendant Drews is a resident and citizen of Florida.

25.     The Defendants identified in paragraphs 18-20 (Danzig, Ha-Ngoc, and Lawlor) are referred to as the "Audit Committee Defendants".  The Defendants identified in paragraphs 16-24 are sometimes referred to collectively herein as the "Director Defendants" or the "Individual Defendants".  The Individual Defendants and HGS are collectively referred to herein as the "Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

26.     As directors of HGS, the Individual Defendants, Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, Young, and Drews, owed and/or owe to HGS specific fiduciary obligations.  These fiduciary duties include the duty to act loyally and in good faith, and the duty to speak with candor in responsibly overseeing the Company.  Their roles as directors and officers of HGS require them to install effective internal controls, make reasonable inquiry, and maintain oversight and supervision of the Company.

27.     Under HGS's Audit Committee Charter (the "Charter"), the Audit Committee Defendants (Defendants Danzig, Ha-Ngoc, and Lawlor) owed and owe additional duties and obligations to the Company.  The Charter requires the Audit Committee Defendants to, *inter alia*:

(a)     obtain and review, at least annually, management's statement of responsibility for establishing adequate internal controls and procedures for financial reporting and disclosure controls, and an assessment of the effectiveness of such internal controls and procedures for financial reporting, as well as its disclosure controls based on management's evaluation of those controls and procedures as of the end of the most recent filed year, to be included in the Company's annual report on Form 10-K, in advance of such filing;

(b)      review the Company's quarterly consolidated financial statements with management and the independent accountants prior to the filing of the Company's quarterly reports on Form 10-Q and the disclosures of each of the CEO and CFO required to be included therein, and review with the independent accountants any items identified by them for discussion with the Audit Committee;

(c)      review with management its quarterly evaluation of the effectiveness of the design and operation of the Company's internal controls and procedures for financial reporting, as well as its disclosure controls and procedures, and the Chairman of the Audit Committee may represent and act on behalf of the entire Audit Committee for purposes of this review;

(d)      determine whether to recommend to the Company' board of directors that the audited financial statements be included in the Company's annual report on Form 10-K for filing with the SEC;

(e)      prepare any report, including any recommendation of the Audit Committee, required by the rules of the SEC to be included in the Company's annual proxy statement; and

(f)      review and discuss with management the financial information in the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, and financial information and earnings guidance provided to analysts and ratings agencies, and the Chairman of the Audit Committee may represent and act on behalf of the entire Audit Committee for purposes of this review.

28.      The Individual Defendants breached their fiduciary duties as detailed herein. Throughout the Relevant Period, the Individual Defendants caused HGS to make materially false

and misleading statements concerning Benlysta and its associated clinical trials, reporting practices, and internal controls, and the Individual Defendants permitted such conduct to take place within the Company. Examples of such misconduct and wrongdoing on the part of the Individual Defendants, and the results thereof, were provided when, on November 12, 2010, the FDA released its staff analysis of Benlysta, outlining the FDA's safety worries relating to Benlysta's association with suicide. These concerns, stemming from HGS's studies and trials over the course of several years, had remained undisclosed by the Company and unknown to investors and shareholders prior to the FDA's revelations that were made public in the FDA's staff analysis of Benlysta in November 2010.

29.     In the wake of these disclosures, HGS' share price plummeted over 10% from the day prior to the release of the report, closing at $25.32 on November 12, 2010 following the FDA's disclosure of a previously undisclosed suicidal association with HGS' potential drug Benlysta, highlighting the omission of material information in previously filed reports and statements by the Individual Defendants regarding Benlysta, and deficiencies in HGS' internal controls and failing to address this material omission and in causing materially false and misleading statements to be disseminated to the Company's shareholders.

30.     Despite their possession of non-public, materially adverse information relating to the Company, the Individual Defendants disregarded the fact that adverse material facts were not disclosed to, and were being concealed from, the investing public. The Individual Defendants breached their fiduciary duties by their failure to prevent the Company from violating the law, by their failure to install internal controls designed to prevent such subterfuge, and by their failure to maintain oversight and manage the Company.

31.     As a result of the Individual Defendants' aforementioned breaches of their fiduciary duties and attendant violations of their obligations as directors of HGS, due to the absence of good faith and a reckless disregard for their duties to the Company and its shareholders, the Company is now the subject of class action litigation alleging violation of the federal securities laws, which necessitates the Company incurring wasteful costs and risks. Specifically, a case titled *Miraglia v. Human Genome Sciences, Inc., et al.* was filed in the United States District Court for the District of Maryland on November 10, 2011, and a case titled *Pokoik v. Human Genome Sciences, Inc., et al.* was filed in the United States District Court for the District of Maryland on November 21, 2011.  Said securities fraud litigation arose from the Individual Defendants' wrongful course of conduct.

## V.     FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Background

32.     SLE is a chronic, life-threatening autoimmune disease.  Approximately five million people worldwide, including approximately 1.5 million people in the United States, suffer from various forms of lupus, such as SLE.  Symptoms of lupus may include extreme fatigue, painful and swollen joints, unexplained fever, skin rash, and kidney problems, and the disease can lead to arthritis, kidney failure, heart and lung inflammation, central nervous system abnormalities, inflammation of the blood vessels, and blood disorders.  It appears most often in the younger population, between the ages of 15 and 45, and 90% of those diagnosed with lupus are women.

33.     Benlysta is the trade name for belimumab, an investigational human monoclonal drug developed by HGS to treat various forms of lupus, including SLE.  Benlysta specifically recognizes and inhibits the biological activity of B-lymphocyte stimulator, or BLyS®.  BLyS is a

naturally occurring protein discovered by HGS that is required for the development of B-lymphocyte cells into mature plasma B cells.  Plasma B cells produce antibodies, the body's first line of defense against infection.  With lupus and other autoimmune diseases, elevated levels of BLyS are believed to contribute to the production of autoantibodies – antibodies that attack and destroy the body's own healthy tissues.  The presence of autoantibodies appears to correlate with disease severity.

34.     Between October 2003 and February 2006, HGS conducted a Phase 2 placebo-controlled, double blind clinical study of Benlysta, with the study code-named L02.  Following completion of the L02 study, another study, code-named LBSL99, began tracking the patient participants from L02.  The LSBL99 study is ongoing.

35.     In August 2006, HGS and GlaxoSmithKline PLC ("GSK") entered into a definitive co-development and co-commercialization agreement under which HGS had responsibility for conducting the belimumab Phase 3 trials with assistance from GSK.  The two companies agreed to share equally in Phase 3/4 development costs, sales and marketing expenses, and profits of any product commercialized under the agreement.

36.     The Phase 3 development program for belimumab includes two double-blind, placebo-controlled, multi-center Phase 3 superiority trials – BLISS-52 and BLISS-76 – to evaluate the efficacy and safety of belimumab plus standard of care, versus placebo plus standard of care, in serologically active (*i.e.*, autoantibody-positive) patients with SLE.  This was the largest clinical trial program ever conducted in lupus patients.  BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America, and Eastern Europe.  BLISS-76 enrolled and randomized 826 patients at 133 clinical sites in 19 countries,

primarily in North America and Europe.  The BLISS-52 study began in May of 2007 and ended

in July 2009.  The BLISS-76 study began in December 2006 and ended in October 2010.

37.     On November 28, 2008, HGS filed a shelf registration statement registering up to

$400 million of HGS securities for sale.  This shelf registration statement was amended on April

29, 2009 and declared effective by the SEC on May 4, 2009 (the "Shelf Registration Statement").

The Shelf Registration Statement was signed by Individual Defendants Watkins, Karabelas,

Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, and Young, and expressly stated: "We

incorporate by reference any filings we make with the SEC after the date of this prospectus under

Section 13(a), 13(c), 14 or 15(d) of the Exchange Act," and any subsequently-filed prospectuses.

38.     On July 20, 2009, HGS issued a press release announcing the positive results of

the BLISS-52 study.  The press release contained comments from HSG' President and CEO,

Defendant Watkins, and stated in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC
> (GSK) today announced that BENLYSTA™ (belimumab, formerly LymphoStat-
> B®) met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 trials
> in patients with serologically active systemic lupus erythematosus (SLE). In the
> placebo-controlled BLISS-52 study, the results showed that belimumab plus
> standard of care achieved a clinically and statistically significant improvement in
> patient response rate at Week 52, compared with standard of care alone. Study
> results also showed that belimumab was generally well tolerated, with adverse
> event rates comparable between belimumab and placebo treatment groups.
>
> "The BLISS-52 results demonstrated that BENLYSTA has the potential to
> become the first new approved drug in decades for people living with systemic
> lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS.
> "Given the limited treatment options currently available, patients would benefit
> greatly from potential new treatments. BENLYSTA is an outstanding example of
> the type of treatment HGS is working to develop and bring to patients. Assuming
> positive results in November from our second Phase 3 trial of BENLYSTA, we
> and GSK plan to submit marketing applications in the United States, Europe and
> other regions in the first half of 2010."

39.     On July 29, 2009, HSG filed a pricing prospectus with the SEC indicating it had pulled from its $400 million shelf and sold 23,215,000 shares of its common stock at a price of $14.00 per share (the "July Registration Statement").  The July Registration Statement expressly incorporated by reference the July 20, 2009 press release and any filings made by HGS subsequent to the July Registration Statement.

40.     Less than one week later, on August 3, 2009, HGS issued a press release announcing the closing of its July 29, 2009 public offering, stating in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 26,697,250 newly issued shares of its common stock at a price to the public of $14.00 per share, which includes 3,482,250 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $356.7 million, after deducting the underwriting discount and estimated offering expenses.
>
> Goldman, Sachs & Co. and Citigroup Global Markets Inc. acted as joint book-running managers for the offering and Credit Suisse Securities (USA) LLC and J.P. Morgan Securities Inc. acted as co-managers for the offering.

41.     On October 20, 2009, HGS issued a press release announcing the positive Phase 3 study results for Benlysta in SLE.  The press release stated, in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-52, the first of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The data, which will be presented today in Philadelphia at the 73rd Annual Scientific Meeting of the American College of Rheumatology (ACR), demonstrate that, in BLISS-52, belimumab plus standard of care achieved a clinically and statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also show that belimumab was generally well tolerated, with adverse event rates comparable between belimumab and placebo treatment groups.
>
> "The BLISS-52 Phase 3 results presented at ACR demonstrate that the efficacy of treatment with BENLYSTA plus standard of care was superior to that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "These data were statistically significant and

were strongly supported across multiple measures of clinical effect and multiple time-points. Of note, a greater percentage of patients receiving BENLYSTA were able to reduce their use of steroids."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "We have been pleased by the consistency of benefit demonstrated by belimumab in the BLISS-52 study, and we hope to confirm these results in the second Phase 3 study which is to report shortly. We very much hope that we will be able to deliver a new option for the treatment of this debilitating disease." Belimumab is an investigational drug and the first in a new class of drugs called BLyS-specific inhibitors. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

42.   On October 29, 2009, HGS amended its Shelf Registration Statement and filed a prospectus (the "Prospectus") with the SEC.  The amendment to the Shelf Registration Statement expressly incorporated by reference the July 20th and August 3rd releases and subsequently filed prospectuses, and was signed by Individual Defendants Watkins, Karabelas, Danzig, Drews, Gowen, Ha-Ngoc, LaMattina, Lawlor, and Young.

43.   On November 2, 2009, HGS issued a press release announcing positive results in the second of two Phase 3 trials of Benlysta.  The press release contained comments from HGS's President and CEO, Defendant Watkins, and stated in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that BENLYSTA™ (belimumab) met the primary endpoint in BLISS-76, the second of two pivotal Phase 3 trials in seropositive patients with systemic lupus erythematosus (SLE). BLISS-76 study results through 52 weeks showed that belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.

"The BLISS-76 results confirm our view that BENLYSTA has the potential to become the first new approved drug in decades for people living with systemic lupus," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We take great pride in the innovation and scientific rigor that has made it possible to bring BENLYSTA to this point. We plan to submit marketing

17

applications in the first half of 2010, following discussions with regulatory authorities in the United States, Europe and other regions. We will continue to work with GSK to advance this drug to the market where it may benefit patients with significant need."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "The results from this second pivotal Phase 3 trial reinforce our belief that belimumab could deliver a significant therapeutic option for patients with lupus who have had no new treatment in fifty years. We look forward to continuing our collaboration with HGS in order to bring this important medicine to patients."

44.     On December 2, 2009, HGS filed a supplement to its Prospectus (the "Prospectus Supplement") with the SEC, which stated, in relevant part:

***BENLYSTA***

BENLYSTA is a BLyS-specific inhibitor. We are developing BENLYSTA with GSK under a co-development and co-commercialization agreement entered into in August 2006. The Phase 3 development program for BENLYSTA includes two double-blind, placebo-controlled, multi-center Phase 3 superiority trials — BLISS-52 and BLISS-76 — to evaluate the efficacy and safety of BENLYSTA plus standard of care, versus placebo plus standard of care, in seropositive patients with SLE. This is the largest clinical trial program ever conducted in lupus patients. BLISS-52 randomized and treated 865 patients at 90 clinical sites in 13 countries, primarily in Asia, South America and Eastern Europe. BLISS-76 randomized and is treating 819 patients at 136 clinical sites in 19 countries, primarily in North America and Europe. The design of the two trials is similar, but the duration of therapy in the two studies is different — 52 weeks for BLISS-52 and 76 weeks for BLISS-76. We designed the Phase 3 program for BENLYSTA in collaboration with GSK and leading international SLE experts, and the program is being conducted under a Special Protocol Assessment agreement with the FDA.

***BLISS-52***

On July 20, 2009, we, together with GSK, announced that BENLYSTA met the primary endpoint in BLISS-52, the first of two pivotal Phase 3 clinical trials in patients with serologically positive SLE. Based on an intention-to-treat analysis, BENLYSTA met its primary efficacy endpoint of superiority versus placebo at Week 52. A clinically and statistically significant improvement was shown in patient response rate for BENLYSTA plus standard of care versus placebo plus standard of care: 57.6% for 10 mg/kg BENLYSTA, 51.7% for 1 mg/kg BENLYSTA, and 43.6% for placebo (p=0.0006 and p=0.011 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo). Patient response was defined by an improvement in SELENA SLEDAI (a weighted cumulative index of lupus

disease activity) score of 4 points or greater, no clinically significant BILAG (a clinical measure of lupus disease activity) worsening, and no clinically significant worsening in the Physician's Global Assessment (a measure of disease activity in clinical trials). Results for each individual component of the patient response rate were consistent with the overall improvement shown for the primary endpoint.

Results for pre-specified major secondary efficacy endpoints were:

- A significantly greater percentage of patients receiving BENLYSTA achieved a reduction in SELENA SLEDAI score of at least 4 points by Week 52, with 58.3% for 10 mg/kg BENLYSTA, 53.1% for 1 mg/kg BENLYSTA, and 46.0% for placebo (p=0.0024 and p=0.019 for 10 mg/kg and 1 mg/kg BENLYSTA, respectively versus placebo).

- Improvement in the Physician's Global Assessment at Week 24 was greatest in the 10 mg/kg BENLYSTA treatment group versus placebo (p=0.0003 for 10 mg/kg and p=0.27 for 1 mg/kg BENLYSTA, respectively) with improvement observed within four to eight weeks.

- A higher percentage of patients in both BENLYSTA treatment groups, versus placebo, had their average prednisone dose reduced by at least 25% from baseline to 7.5 mg per day or less during the last 12 weeks of study (p=0.053 for 10 mg/kg and p=0.025 for 1 mg/kg BENLYSTA, respectively versus placebo).

- Improvement in health-related quality of life at Week 24 as measured by the SF-36 Physical Component Summary ("PCS") (a survey for measuring health status and health-related quality of life) score was not significantly different among treatment groups. However, although not a major secondary endpoint, improvement in the SF-36 PCS score at Week 52 was significantly greater in both BENLYSTA treatment groups (p=0.025 for 10 mg/kg and p=0.027 for 1 mg/kg BENLYSTA, respectively versus placebo).

Study results also showed that BENLYSTA was generally well tolerated, with rates of overall adverse events, serious adverse events, infections and fatalities comparable between BENLYSTA and placebo treatment

45.    On December 3, 2009, HGS filed a pricing prospectus with the SEC indicating that HGS had pulled down another 15,500,000 shares of its common stock from its $400 million shelf, for sale at a price of $26.75 per share (the "December Registration Statement").  The December Registration Statement expressly incorporated by reference the July 20th, August 3rd, October 20th, November 2nd, and December 2nd press releases, along with any filings made by HGS subsequent to the December Registration Statement.

19

46.     On December 8, 2009, HGS issued a press release announcing the closing of its public offering of 17,825,000 newly issued shares of common stock at a price of $26.75 per share.  The press release, which included comments from Defendant Watkins, stated in relevant part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the closing of its public offering of 17,825,000 newly issued shares of its common stock at a price to the public of $26.75 per share, which includes 2,325,000 shares sold upon exercise by the underwriters of their option to purchase additional shares. The net proceeds to the Company from the offering are approximately $456.3 million, after deducting the underwriting discount and estimated offering expenses.

47.     On April 20, 2010, the Company issued a press release announcing its topline 76-week results of its Phase 3 trial of Benlysta.  The press release included comments from HGS's President and CEO, Defendant Watkins, and stated in relevant part:

> **ROCKVILLE, Maryland, and LONDON, UK – April 20, 2010 [note correction below made April 21, 2010]** – Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced topline secondary endpoints from BLISS-76, the second of two pivotal Phase 3 trials of BENLYSTA™ (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). BENLYSTA 10 mg/kg already met its primary efficacy endpoint at Week 52 in both BLISS-52 and BLISS-76, as announced in July and November 2009.
>
> At Week 76 in the BLISS-76 study, belimumab plus standard of care showed higher response rates compared with placebo plus standard of care as measured by the SLE Responder Index; however, this secondary endpoint did not reach statistical significance. Study results also showed that belimumab continued to be generally well tolerated, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups.
>
> "A positive overall picture has emerged from our pivotal Phase 3 studies of BENLYSTA, including its achievement of statistical significance on the primary efficacy endpoint at Week 52 with a favorable safety profile in both BLISS-52 and BLISS-76," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We view the results of these studies as strongly supportive of our view that BENLYSTA has the potential to become the first new approved drug in more than 50 years for people living with systemic lupus."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Based on the totality of data in BLISS-52 and BLISS-76, we believe that belimumab could deliver a significant therapeutic option for patients with lupus, a chronic condition which has a devastating effect on the lives of patients living with the disease."

48.     On June 10, 2010, HGS issued a press release announcing its submission of a

Biologics License Application ("BLA") to the FDA for market approval of Benlysta for the

purposes of treating SLE.  The press release stated in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced that GlaxoSmithKline (GSK) has submitted a Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) for approval to market BENLYSTA® (belimumab) for the treatment of systemic lupus erythematosus (SLE).

The MAA submission includes the results of two pivotal Phase 3 clinical trials in autoantibody-positive patients with SLE showing that belimumab met its primary endpoint. In the Phase 3 studies, known as BLISS-52 and BLISS-76, belimumab 10 mg/kg plus standard of care achieved a statistically significant improvement in patient response rate as measured by the SLE Responder Index at Week 52, compared with placebo plus standard of care. Study results also showed that belimumab was generally well tolerated in BLISS-52 and BLISS-76, as demonstrated by a similar rate of discontinuations due to adverse events across treatment groups, with overall adverse event rates comparable between belimumab and placebo treatment groups. The design of the two trials was similar, but the duration of therapy in the two studies was different – 52 weeks for BLISS-52 and 76 weeks for BLISS-76. HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts. The two studies treated a total of 1,684 patients.

49.     On June 17, 2010, HGS issued a press release announcing the full presentation of

the results of the BLUSS-76 Phase 3 study of Benlysta.  The press release stated in relevant part:

Human Genome Sciences, Inc. (NASDAQ: HGSI) and GlaxoSmithKline PLC (GSK) today announced the presentation of additional results from BLISS-52, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE).  The additional data will be presented in Rome at the 2010 Congress of the European League Against Rheumatism (EULAR) on Saturday, June 19.

"The BLISS-52 Phase 3 results presented at EULAR demonstrate that the efficacy of treatment in this study with belimumab plus standard of care was superior to

that of placebo plus standard of care," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS.  "Belimumab has met the primary endpoint in both of its pivotal Phase 3 trials.  Earlier this month, we and GSK submitted marketing applications for belimumab in the United States and Europe.  We now look forward to the consideration and conclusions of regulatory authorities."

50.     On that same day, HGS issued a press release stating in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced the full presentation of results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The results will be presented today in Rome at the 2010 Congress of the European League Against Rheumatism (EULAR).

"The BLISS-76 Phase 3 results presented at EULAR extend the findings of previous studies and reinforce our belief that belimumab, assuming regulatory approval, could deliver a significant therapeutic option for seropositive patients with systemic lupus," said David C. Stump, M.D., Executive Vice President, Research and Development, HGS. "In both of its pivotal Phase 3 trials in these patients, belimumab 10 mg/kg met its primary endpoint. The efficacy of treatment with belimumab plus standard of care compared with placebo plus standard of care was superior in both studies, with overall adverse event rates for belimumab comparable to placebo."

Carlo Russo, M.D., Senior Vice President, Biopharm Development, GSK, said, "Belimumab is the first medicine developed specifically for lupus that has reached this late stage of clinical development with positive results. The BLISS-76 results presented at EULAR, taken together with the results of BLISS-52, reinforce our belief that belimumab may play an important role for patients living with lupus."

51.     On June 25, 2010, HGS issued a press release announcing the presentation of

additional Phase 3 study results from BLISS-76.  The press release stated in relevant part:

Human Genome Sciences, Inc. (Nasdaq: HGSI) today announced the presentation of additional results from BLISS-76, one of two pivotal Phase 3 trials of BENLYSTA® (belimumab) in seropositive patients with systemic lupus erythematosus (SLE). The additional data will be presented in Vancouver at the 9th International Congress on Systemic Lupus Erythematosus on Friday and Saturday, June 25-26.

"The BLISS-76 Phase 3 results presented at the International Congress on SLE include new data showing that belimumab treatment, consistent with its

mechanism of action, resulted in selective and significantly greater reductions in levels of B-cell and plasma B-cell subsets, with significant preservation of memory B-cells," said William W. Freimuth, M.D., Ph.D., Vice President, Clinical Research – Immunology, Rheumatology and Infectious Diseases, HGS. "Importantly, belimumab did not significantly affect the ability of SLE patients to maintain a protective response to vaccines, a finding that is consistent with the preservation of memory B-cells."

52.     On August 19, 2010, HGS issued a press release announcing the FDA's priority review designation for Benlysta as a potential treatment for SLE.  The press release stated in part:

> Human Genome Sciences, Inc. (Nasdaq: HGSI) and GlaxoSmithKline PLC (GSK) today announced that the U.S. Food and Drug Administration (FDA) has granted a priority review designation to BENLYSTA® (belimumab) as a potential treatment for systemic lupus erythematosus (SLE). A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists. The FDA has assigned belimumab a Prescription Drug User Fee Act (PDUFA) target date of December 9, 2010.
>
> The Biologics License Application (BLA) for belimumab was submitted to the FDA on June 9, 2010, and includes the results of two pivotal Phase 3 clinical trials that treated a total of 1,684 autoantibody-positive patients with SLE. HGS designed the Phase 3 program for belimumab in collaboration with GSK and leading international SLE experts, and in consultation with the FDA.
>
> "We are very pleased that FDA has chosen to grant priority review to belimumab, the first in a new class of drugs called BLyS-specific inhibitors," said H. Thomas Watkins, President and Chief Executive Officer, HGS. "We believe that the priority review designation speaks both to the significant medical need of people living with lupus and to the potential belimumab may hold as a new treatment option for these patients."

53.     On October 27, 2010, HGS issued a press release announcing the date of an FDA Advisory Committee meeting regarding Benlysta.  The press release stated in relevant part:

> In August 2010, the FDA granted a priority review designation to BENLYSTA (belimumab) as a potential treatment for autoantibody-positive patients with clinically active systemic lupus erythematosus (SLE). A priority review designation is granted to drugs that, if approved, offer major advances in treatment or provide a treatment where no adequate therapy exists. The FDA has assigned belimumab a PDUFA target date of December 9, 2010, and an FDA Advisory Committee meeting to consider the belimumab Biologics License

Application (BLA) is scheduled to take place on November 16, 2010. No new drug for lupus has been approved by regulatory authorities in more than 50 years.

54.     The statements referenced above in paragraphs 37-53 were each  materially false and misleading when made because they misrepresented and failed to disclose the materially adverse fact that HGS's potential new drug Benlysta was associated with suicide in clinical studies of the drug, a fact which was known to or should have been known to the Individual Defendants.

**B.     The Truth is Revealed**

55.     On November 12, 2010, the FDA posted briefing documents pertaining to the upcoming hearing of the FDA Advisory Committee scheduled for November 16, 2010.  The briefing documents stated in relevant part:

> There were two completed suicides across the double-blind placebo controlled studies, both in patients treated with belimumab (one each in study L02 and study C1057).  In addition there was another completed suicide in a belimumab treated patient during the safety extension period of study L02 (study L99).  There were four cases of suicide attempts or suicidal ideation, all in patients treated with belimumab (one each in placebo-controlled studies L02 and C1057, and two in the safety extension period of study L02 called study L99).

> *              *              *

> Clearly there is a need for effective therapies in SLE.  However whether belimumab's benefits sufficiently outweigh its risks is the crux of the issue. Given that flares and steroid reduction may not be impacted, is a reduction of 4 points in the SELENASLEDAI (the main component driving Study 1056's efficacy result) clinically meaningful?  If belimumab only has a modest effect for some patients and manifestations, **is a possible increased risk of death, infection, or neuropsychiatric adverse effects worth the potential benefit?**

[Emphasis added.]

56.     As a result of this disclosure, the price of HGS's shares dropped $2.88, or nearly 11%, to close at $23.60 per share on November 12, 2010.

57.     The dissemination of these materially false and misleading statements was the direct result of the Individual Defendants' abdication of their fiduciary duties.  Despite their knowledge of Benlysta's association with suicide in clinical trial studies, the Individual Defendants continued to misrepresent the potential risks and associations and failed to implement proper safeguards.  The Individual Defendants failed to prevent HGS's officers and directors from disseminating false and misleading information to the investing public and failed to install internal controls designed to prevent subterfuge and to maintain oversight and manage the Company so that it does not act in violation of the law.

58.     As a result of the Individual Defendants' breaches of their fiduciary duties, the Company was caused to fail to disclose in its press releases and SEC filings significant risks regarding suicide and its association with Benlysta in clinical studies.  HGS has been severely damaged, including in that it is now forced to defend itself against securities fraud class action litigation alleging violation of the federal securities laws, which necessitates the Company incurring wasteful defense, investigatory and other costs, and likely, substantial liability.  The Individual Defendants' breaches of their fiduciary duties to the Company have resulted in the wasting of corporate assets and have also enabled the unjust enrichment of Defendant Drews as set out in further detail in paragraphs 24.

59.     Accordingly, HGS has been and will continue to be damaged.

## VI.     DERIVATIVE ALLEGATIONS

60.     Plaintiff brings this action derivatively on behalf of and for the benefit of HGS to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein.  The Company is a nominal defendant named solely in a derivative capacity.

61.     Plaintiff purchased shares of HGS and continued to hold such shares at all times relevant and through the present.  Thus, Plaintiff was an HGS shareholder during the wrongdoing complained of herein.

62.     Plaintiff will fairly and adequately represent the interests of HGS, and has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

63.     The wrongful acts complained of herein subject and will persist in subjecting HGS to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

### A.      The Futility of Demand

64.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

65.     At the time of the filing of this action, HGS' Board of Directors (the "Board") is composed of twelve directors, namely, Defendants Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young, as well as non-defendants Collin Goddard, George Morrow, Greg Norden, and Allan Baxter.  Plaintiff has not made a demand on the Board to bring this action because doing so would be a futile and useless act for the reasons detailed below.

66.     Eight of the twelve current directors (Watkins, Karabelas, Danzig, Ha-Ngoc, Lawlor, Gowen, LaMattina, and Young, and collectively, the "Current Director Defendants") have been named as defendants in this action and each of those eight was a director during the time period when the Individual Defendants are alleged to have breached their fiduciary duties in causing the Company to issue materially false and misleading statements in the Company's

public filings and press releases, thus harming the Company and unjustly enriching Defendant Drews.

67.     Plaintiff did not make a demand on the Board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct on the part of the Current Director Defendants, which consist of a majority of the Board, showing a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence. Demand is excused because the Current Director Defendants exhibited antipathy towards investigation or prosecuting the wrongdoing set forth herein.

68.     The Current Director Defendants' acts, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

69.     Demand is excused because the majority of the members of the Board, i.e. the Current Director Defendants, are interested in the outcome of this litigation, having caused HGS to issue false and materially misleading statements to the investing public in breach of their fiduciary duties. Consequently, those directors face a substantial likelihood of liability and are interested in the outcome of this action.

70.     The Audit Committee Defendants, defendants Danzig, Ha-Ngoc, and Lawlor, reviewed and approved the improper statements contained within the Company's reports and press releases filed with the SEC by virtue of their role as members of the Board's Audit Committee.  Among the current and former members of the Audit Committee, two of the Current Director Defendants, defendants Ha-Ngoc and Lawlor, have been determined to be "audit committee financial experts" with possession of the requisite financial and accounting expertise and knowledge regarding the Company's financial reporting process and internal controls.  Ha-

Ngoc is the current Chairman of the Audit Committee.  Owing to their specialized expertise and heightened duties under the Audit Committee Charter, the review and subsequent approval of HGS' improper statements and allowance for loan losses is particularly egregious.  As detailed in paragraph 27 herein, the Charter provides that the Audit Committee Defendants owe a heightened responsibility to HGS and its shareholders, in that they are responsible for compliance with accounting, legal, and regulatory requirements.  According to the Charter, the Audit Committee Defendants are appointed to monitor "(1) the integrity of the Corporation's financial statements and other financial statements provided by the Corporation to its stockholders, (2) the Corporation's compliance with legal and regulatory requirements; (3) the Corporation's relationship with their independent accountants, including their engagement, performance, qualifications and independence; and (4) the performance of the Corporation's internal audit function, internal controls and disclosure controls."  As such, the Audit Committee Defendants were uniquely responsible for allowing the improper statements related to the Company's potential drug Benlysta and internal controls related to disclosures and financial reporting.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases and SEC filings made to the investing public, and, despite their access to adverse and material non-public information associating Benlysta with suicide, caused and allowed such improper statements and omissions and the wrongdoing described herein.  Thus, the Audit Committee Defendants, and, in particular, HGS's Audit Committee financial experts – current Chairman of the Audit Committee, Defendant Ha-Ngoc, and former member of the  Audit Committee, Defendant Lawlor – have demonstrated actions taken in bad faith that constitute breaches of their fiduciary duties, and as such, any demand upon them would have been futile.

71.     In addition, Defendant Watkins admittedly lacks independence due to the fact that he served, throughout the Relevant Period, and continues to serve in the position of President and CEO of HGS.  The principal professional occupation of Watkins is his employment as President and CEO of HGS, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, which are material to Watkins.  According to the Company's most recent proxy statement filed with the SEC on March 30, 2011, the Company acknowledges that Defendant Watkins lacks independence, due to his interest in maintaining his executive positions at HGS, which renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

72.     Demand upon the Board is excused because the damage to the Company alleged herein is a direct result of a majority of the Board's failure to implement internal controls and oversee and manage the Company as they were obligated to do, which cases the dissemination of the materially false and misleading statements.  Accordingly, the Board cannot exercise independent objective judgment in deciding whether to bring this action because they are personally interested in the outcome of this lawsuit as it is their actions that have subjected HGS to potential liability and harm.

73.     Further, any suit by the Company to remedy these wrongs would likely expose the Current Director Defendants and HGS to further liability for violations of the federal securities laws, in that it no doubt would result in additional civil actions being filed against one or more of the Current Director Defendants (and would further strengthen the existing civil litigation against the Company and the Current Director Defendants).  Thus the Current Director Defendants are hopelessly conflicted in making any supposedly independent determination of whether the Company should sue the Board.  Thus far, at least two class

action complaints for violations of the federal securities laws has been filed against the Company as a result of the wrongdoing set forth herein: *Miraglia v. Human Genome Sciences, Inc., et al.* (Index No: 8:2011-cv-03231), filed in the United States District Court for the District of Maryland on November 10, 2011, and *Pokoik v. Human Genome Sciences, Inc., et al.* (Index No: 8:2011-cv-03353), filed in the United States District Court for the District of Maryland on November 21, 2011.

74.     HGS has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein.  Yet the Board has not authorized the Company to file a lawsuit against the Individual Defendants or others who were responsible for the wrongful conduct to attempt to recover for HGS any part of the damages the Company suffered and will suffer thereby.

75.     Despite the Board having knowledge of the facts underpinning the claims and causes of action raised by Plaintiff, the Board has failed and refused to seek to recover for HGS in connection with any of the wrongdoing alleged by Plaintiff herein.

76.     If the Current Director Defendants are protected against personal liability for their acts of mismanagement and breach of fiduciary duties as alleged in this Complaint by directors' and officers' liability insurance ("D & O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of HGS.  However, the D & O Insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by HGS against these defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause HGS to sue themselves of certain of the officers of HGS, there would be no D & O Insurance protection and thus, a further reason why the directors will not bring

suit upon themselves.  On the other hand, if this suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no D & O Insurance, then the Board will not cause HGS to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

77.    The Board cannot exercise independent objective judgment in deciding whether to bring this action because a majority of its members (the Current Director Defendants) are personally interested in the outcome of this lawsuit as it is their actions that have subjected HGS to liability.  Further, the actions and inactions complained of herein are violations of the Current Director Defendants' fiduciary duties that are incapable of ratification.

78.    Accordingly, for all of the foregoing reasons, making a pre-suit demand on the Board would have been futile, and thus is excused.

79.    Plaintiff has not made a demand on the shareholders of HGS to institute this action because such demand would be a futile and useless act for at least the following reasons: (a) HGS is a publicly held company with over 189 million shares outstanding and thousands of shareholders; (b) making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of learning the names, addresses, or phone numbers of all of the Company's shareholders; and (c) making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

**AGAINST ALL INDIVIDUAL DEFENDANTS**
**FOR BREACH OF FIDUCIARY DUTY IN DISSEMINATING MATERIALLY FALSE,**
**MISLEADING AND INCOMPLETE INFORMATION**

80.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     Each of the Individual Defendants had a duty to ensure that HGS disseminated accurate, truthful and complete information to shareholders.

82.     The Individual Defendants violated their fiduciary duties of candor, loyalty, good faith and care by causing or allowing the Company to disseminate materially false and misleading information to HGS shareholders through SEC filings and other statements detailed herein, and by omitting to state material facts necessary to make statements made not misleading.

83.     As a direct and proximate result of their breaches of their fiduciary duties, the Individual Defendants have substantially damaged HGS.

## COUNT II

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN INTERNAL CONTROLS AND FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

84.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

85.     The Individual Defendants owed and owe to HGS fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and continue to owe HGS the highest obligations of good faith, fair dealing, loyalty and due care.

86.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

87.     The Individual Defendants ignored the obvious problems with HGS' internal controls and procedures and failed to make a good faith effort to correct the problems and prevent their repetition.

88.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, HGS has sustained substantial damages, not only monetarily, but also to its corporate image and goodwill.

## COUNT III

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     As a result of the Individual Defendants' misconduct, and by failing to conduct proper supervision, all as described above, the Individual Defendants have caused HGS to incur (and likely to continue to incur) significant legal costs to defend itself as a result of the Individual Defendants' unlawful actions, along with investigatory and other costs, as well as likely many millions of dollars in potential legal liability, and to waste its assets by paying improper compensation and bonuses to its directors that have breached their fiduciary duties. Such incurred and expected liability and costs resulting from the Individual Defendants' misconduct amount to an irrational squandering of the Company's assets for no valid corporate purpose.

91.     As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

92.     Plaintiff, on behalf of HGS, has no adequate remedy at law.

## COUNT IV

## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     By their wrongful acts, omissions, and breaches of fiduciary, the Individual Defendants were unjustly enriched at the expense of and to the detriment of HGS.   The

Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to HGS.

95.     Defendant Drews sold HGS stock while in possession of material, adverse, non-public information that, in being concealed, allowed the share price of HGS stock to remain artificially inflated.  As a result, Defendant Drews profited from his misconduct and was unjustly enriched through his exploitation of material and adverse inside information.

96.     Plaintiff, on behalf of HGS, seeks restitution from the Individual Defendants, and each of themselves, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, from or in the course of their wrongful conduct and fiduciary breaches.

97.     Plaintiff, on behalf of HGS, has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.     Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing HGS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen HGS's oversight of its supervision of

operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities, as applicable, or their other assets so as to assure that plaintiff on behalf of HGS has an effective remedy;

      D.     Awarding to HGS restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

      E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

      F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated: December 20, 2011

**LEVI & KORSINSKY, LLP**

Donald J. Enright (USDC-MD Bar No. 13551)
1101 30th Street, NW
Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121

*Attorney for Plaintiff*